**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**JACKSON DIVISION**

| | | |
|---|---|---|
| **WASTE SERVICES OF DECATUR, LLC,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:17-cv-01030** |
| | ) | |
| **DECATUR COUNTY, TENNESSEE,** | ) | **JURY DEMAND** |
| | ) | |
| **Defendant/Counter-Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **WASTE INDUSTRIES, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## CLAIMS OF DECATUR COUNTY, TENNESSEE AGAINST WASTE INDUSTRIES, LLC

In accordance with this Court's June 6, 2017 Order, Decatur County hereby files the following claims against Waste Industries, LLC pursuant to Rules 19(a)(1)(A) and 20(a) of the Federal Rules of Civil Procedure.

### I.    PROCEDURAL BACKGROUND

On March 23, 2017, Decatur County, Tennessee (the "County") answered a complaint filed against it by Waste Services of Decatur, LLC ("WSD") and filed numerous counterclaims against WSD. The County thereafter moved to join Waste Industries, LLC (referred to herein as "Waste Industries"). After briefing and a hearing on the motion, this Court held that Waste Industries is a necessary party to Decatur County's counterclaims under Rule 19(a)(1)(A). The Court also held *sua sponte* that the County may join Waste Industries as a counter-defendant under Rule 20(a). As the Court found, "Simply put, Decatur County has shown that Waste Industries is involved in the operation of the landfill." June 6, 2017 Order at p. 6 (DE 35). Accordingly, Decatur County now

brings the following claims against Waste Industries for declaratory judgment, public nuisance, negligence/gross negligence/negligence *per se*, and injury to real property.

## II.   CLAIMS AGAINST WASTE INDUSTRIES

### A.   The Parties

1.   The County of Decatur is a political subdivision of the State of Tennessee created pursuant to Tenn. Code Ann. § 5-1-101.

2.   Upon information and belief, Waste Industries, LLC is a North Carolina limited liability company.  Waste Industries, LLC may be served through its registered agent in Tennessee, C T Corporation System, 800 S. Gay Street, Suite 2021, Knoxville, Tennessee 37929-9710.

### B.   Jurisdiction and Venue

3.   Jurisdiction and venue are proper in this Court as this matter is brought pursuant to this Court's June 6, 2017 Order granting Decatur County's Motion for Joinder.

4.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship and the amount in controversy exceeds $75,000.

5.   Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the acts and events of the events giving rise to these counterclaims occurred in this District and the County is a citizen of Tennessee and this District.

6.   This Court has authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

### C.   The Facts

7.   Decatur County is a small county in the West Tennessee region consisting of the city of Parsons, the towns of Decaturville and Scotts Hill, and several unincorporated communities, including Bath Springs.  The County currently houses around 11,000 residents.

8.      Waste Industries, LLC is a limited liability company, with – as was described to the County to induce it to enter into the subject contract – "over $200 million in annual sales, and market value of about $235 million."

### The County Opens a Solid Waste Facility in 1978

9.      In 1978, the County began operating its own solid waste disposal facility.  In late 1992, the County closed its original facility and constructed a new facility on a site North of and adjoining the existing landfill (the "Landfill").  This Landfill, located at 324 Landfill Lane, Bath Springs, Tennessee, handled residential waste from Parsons, Decaturville, Scott's Hill, and rural parts of the County.  Additionally, local residents would haul waste to the Landfill, typically consisting of building and construction waste.

10.      The County is the owner of the property upon which the Landfill is located.

11.      With the goals of efficiency and reduction of waste in mind, the Decatur County Municipal Solid Waste Region Board executed the Municipal Solid Waste Regional Plan (the "Solid Waste Plan") in June 1994.  A true and correct copy of the Solid Waste Plan is attached hereto as **Exhibit 1**.  In Chapter II(K) of the Solid Waste Plan, the waste generated by the County's citizens was described as being insignificant in amount and manageable, due to the depressed economic conditions in the area and the "waste not, want not" attitude of the County residents: "The waste generated by the citizens of Decatur County is not significant and therefore is not that great of a problem to manage."  The Solid Waste Plan for the County reflected that there were just minor amounts of household hazardous waste existing in the County.

12.     When the County operated the Landfill, leachate[1] disposal was straightforward and relatively inexpensive.  The County utilized the wastewater treatment facilities owned by Parsons and Decaturville for treatment and disposal of leachate from the Landfill, because the County does not have its own wastewater treatment facility.  These treatment services were provided at minimal cost to the County.  For example, attached as **Exhibit 2**  is a letter from Decaturville to the County invoicing it for leachate treatment for a four month period of April – July 1995, at a total cost of only $2,052.

### *The County Seeks A Safe, Economic Long-Term Solution for the Operation of the Landfill*

13.     In or around 1996, the County desired to contract operations of its Landfill to a third party.  Accordingly, the County entered into an agreement for Development and Operation of the Sanitary Landfill dated March 4, 1996 (the "Contract") with Waste Services of America, Inc. ("WSA").  A true and correct copy of the Contract is attached hereto as **Exhibit 3**.  Neither Parsons or Decaturville were parties to the Contract.

14.     The Contract makes clear that the County desires to "be free of any and all future environmental liabilities associated with the operation and management" of the Landfill, wants "to protect the public safety, health and welfare, in the most economically feasible, cost effective and environmentally sound manner," and sought "the safest and most economic long-term solution to its solid waste disposal needs."  Contract, pp. 1-2.

---

[1] *Vander Boegh v. EnergySolutions, Inc.*, 536 F.App'x 522, 524, n.1 (6th Cir. 2013) explains leachate in this manner: "Leachate is the liquid substance that drains from a landfill. It contains environmentally harmful material that can pose a threat to the natural water source if not collected properly." Leachate is increased by rainfall into a landfill. Rainfall "leaches" through the waste and is required by state law to be collected, contained and transported safely off-site.  The volume of leachate can range per day, depending on rainfall and landfill size and operations.  The content of leachate reflects the type of waste from which it drained.

15.     The County agreed to exclusively use the Landfill for disposal of its solid and industrial waste and to not contract with any other entity for services being provided by WSA. Contract § 2.6.

16.     In turn, WSA had full, complete, and sole control and direction over all aspects of the operation of the Landfill.  Contract § 4.1(e).

17.     WSA agreed to operate the Landfill in compliance with all applicable federal, state and local laws in all material and technical aspects.  Contract §§ 3.4, 4.1(c).

18.     WSA agreed to operate the Landfill until at least 2026.  Contract § 8.1.

19.     WSA further agreed to operate the Landfill according to generally accepted Landfill standards under the supervision of qualified and trained sanitary Landfill personnel.  Contract § 4.1(a).

20.     WSA agreed not to accept waste generated outside of the Service Area without permission from the County.  Contract § 1.15.  The Service Area is defined as the "incorporated and unincorporated areas of any county which is partly or wholly within seventy-five (75) miles of the political boundary of Decatur County."  Contract § 1.15.

21.     At the end of the life of the Contract, WSA agreed to undertake the closure of the Landfill, including all costs associated with closure, and to perform such closure in conformance with all applicable federal and state governmental rules and regulations for a period of at least thirty years (30) or longer as needed in a manner required by applicable Environmental Laws. Contract § 4.3.  A critical component of closure included posting a "closure bond" with the State of Tennessee that can be triggered to cover the ongoing management costs of the site and protect the State and public.

22.     Regarding the disposal of leachate, the Contract states that the disposal/treatment of leachate "*would remain* at no cost to the Decatur County Landfill and WSA for the life of the site, *in exchange* for free disposal to Parsons and Decaturville *pursuant to Schedule B of the Agreement*." Contract § 2.7 (emphasis added).

23.     Schedule B of the Contract states "provided, however, that the Cities of Decaturville and Parsons *will continue to receive free residential waste disposal* pursuant to this Schedule B *only so long as* leachate treatment and disposal is provided at no cost to the Decatur County Landfill and WSA."  (emphasis added).

24.     As Waste Industries has previously asserted to Parsons and Decaturville, "when the Contract was established it was envisioned by all parties that leachate from the Landfill would be disposed of at no cost to the Decatur County Landfill at either the Town of Parsons or Town of Decaturville wastewater treatment facilities in exchange for free disposal of solid waste from these two municipalities."  *See* Exhibit 15 below.

25.     At the time the parties entered into the Contract, WSA knew or should have known that the Parsons Treatment Program could handle leachate levels as long as the ammonia therein did not exceed 35 mg/l.

### *WSA Begins Accepting Special Waste*

26.     Almost immediately after the Contract was executed, WSA's customers, located largely outside of the County, began submitting applications to the Tennessee Division of Solid Waste Management for industrial waste approvals, including for such waste as wastewater sludge, wheelabrator dust, waste styrene, and paint filters.  Due to the complex chemical characteristics of special waste, its generators typically pay substantially higher price per ton to Landfill operators, such as WSA, to deposit this waste into their Landfill.  Even though the special waste applications

were granted by the Tennessee Department of Environment and Conservation ("TDEC"), TDEC notified each applicant in writing that WSA had the right to refuse to accept the waste.

27.     Just seven months after the contract was inked, WSA began refusing to allow Decaturville to dispose of its residential waste at the Landfill, unless Decaturville either treated leachate from the Landfill or paid for residential waste services.

28.     In response, Decaturville, through its attorney Samuel D. Lipshie at Boult Cummings Conners & Berry (now the Bradley firm), demanded that WSA "or its affiliate, Waste Services of Decatur" (now represented by Bradley) [2] resume allowing Decaturville to dispose of its residential waste.  *See* October 16, 1996 Letter attached as **Exhibit 4.**

29.     The Bradley firm complained that WSA's universe of customers depositing into the Landfill had expanded to sources far outside of the County border and that Decaturville now contributed only one-half of one percent of the total waste flowing into the Landfill.  Thus, it was unfair to expect Decaturville to handle that volume of leachate from all of WSA and WSD's customers.  As the Bradley firm characterized WSA and WSD's demands, "It is ridiculous to contemplate that Decaturville would have thus agreed to provide free leachate treatment for your universe of customers (stretching now to include sources 75 miles from the Decatur County borders), in exchange for free solid waste disposal for their town."  *See* Exhibit 4.

30.     Holding fast to its position that Decaturville treat the leachate from all of WSA and WSD's customers or else pay for residential waste treatment, WSA and WSD simply refused to accept waste from Decaturville residents in the Landfill.  As the Bradley firm described:

> Because of Decaturville's understandable unwillingness to obligate itself to providing this enormously disproportionate amount of leachate treatment, or extortionate and unlawful demands that Decaturville otherwise pay a fee for waste

---

[2] Counsel for WSD was alerted to its prior representation of the Town of Decaturville against WSA, but claims that it has no conflict of interest in now representing WSA's successor against Decatur County.

disposal that is provided all other residents of Decatur County without charge, WSA (or its affiliate, Waste Services of Decatur) has ceased accepting solid waste from Decaturville as of October 1, 1996.

*See* Exhibit 4.

31.     The Bradley firm cited the threat to the public health, welfare, and hygiene caused by WSA and WSD's actions and threatened immediate legal action against them.  Upon information and belief, WSA and WSD resumed accepting waste from Decaturville at no charge after receipt of Mr. Lipshie's letter, even though Decaturville did not treat the leachate from the Landfill.

32.     Throughout 1997, WSA's customers outside of the County petitioned for industrial waste approvals, including for items such as spray paint filters, waste power paint, fiberglass tub production waste, grinding waste, and sewage sludge.  TDEC notified each customer that the decision whether to accept such waste rested with the facility operator, which could refuse to accept the industrial waste.

33.     On November 12, 1997, one of WSA's customers, Tennessee Aluminum Processors in Columbia, Tennessee, obtained approval to dispose of 100 cubic yards per day of aluminum smelting waste into the Landfill, including aluminum dross.

34.     On March 20, 1998, Smelter Services Corporation in Mt. Pleasant, Tennessee obtained permission from TDEC to dispose of 35,000 tons per year of aluminum dross in the Landfill.  In a letter from TDEC to Smelter Services, attached at **Exhibit 5**, TDEC made clear that the ultimate decision whether to accept the waste into the Landfill rested with the landfill operator.

35.     In October 1998, Waste Services of America, Inc. assigned the Contract to its subsidiary, Waste Services of Decatur, LLC ("WSD").

36.     As of December 1998, Parsons was still attempting to treat leachate from the Landfill.

### *Waste Industries Acquires WSD and Assures Financial Support of the Landfill and the "Best Services Possible"*

37.     In January 1999, Waste Services of Decatur, LLC was acquired by Waste Industries, Inc.  Thus, WSD became a wholly owned subsidiary of Waste Industries, Inc., a North Carolina corporation.

38.     In July 1999, WSD asked TDEC's Division of Solid Waste Management for permission to modify the operating permit by constructing temporary leachate storage tanks at the Landfill.  WSD represented that it was sending leachate off-site to several publicly owned treatments works for treatment and disposal after being temporarily stored in the on-site leachate storage tanks.

39.     By this point, WSD and Waste Industries had amassed a significant number of industrial waste customers from outside of Decatur County, including from the cities of: Mount Pleasant, Lobelville, Shelbyville, Henderson, Linden, Savannah, Pulaski, Paris, Jacks Creek, Michie, Clarksville, Bath Springs, and Waynesboro, Tennessee, and Owensboro, Kentucky.

40.     Special waste is considered waste that is difficult or dangerous to manage and may include industrial wastes and hazardous waste.

41.     Waste Industries and WSD accepted a particularly dangerous special waste known as "saltcake" or secondary aluminum smelting waste (hereafter "SAS"), commonly referred to as "aluminum dross."[3]  Industry typically pays a premium per ton to get rid of it.  The SAS came from smelters in Columbia and Mount Pleasant, Tennessee.

---

[3] For an explanation of the hazards created when aluminum dross is accepted into a municipal landfill and the leachate therefrom is sent to a municipal water treatment plant, see *In MD Recycling, Inc. v. Allied Waste Indus.*, 2007 U.S. Dist. LEXIS 69168 (E.D. Tenn. Sept. 18, 2007).  In this case, the Court noted that "aluminum reacts with water and

42.     Waste Industries and WSD also chose to accept SAS dross collected from air pollution control devices known as "bag house dust." These dust bags are comprised of fine particulate and are full of heavy metals.  The SAS and bag house dust were known by industry to chemically react, sometimes violently, with water to produce combustion, flammable gases, and heat.  The SAS and bag house dust also produce copious amounts of ammonia as a result of the same "exothermic" chemical reaction.    Mixing the SAS waste with other special waste, combustible material, or municipal waste exacerbates the chemical reaction.

43.     WSD and Waste Industries knew or should have known that the acceptance of industrial waste, such as SAS and bag house dust, would increase leachate ammonia levels at the Landfill.  As described by the Environmental Protection Agency ("EPA") in a Federal Register Notice published on February 21, 1990, "Dross contains heavy metals (including barium, cadmium, chromium, lead, copper, and manganese) and reacts violently with water to form several gases, including ammonia."  This Notice was published in 1990 by the EPA with respect to a nearby landfill in Island, Kentucky, which had accepted SAS and which the EPA sought to place on the National Priorities List – meaning that the EPA could expend Superfund money for remedial action at the landfill due to the SAS.  *See generally Barmet Aluminum Corp. v. Thomas*, 730 F. Supp. 771 (W.D. Ky. Feb. 15, 1990).

44.     WSD and Waste Industries also knew or should have known that the City of Parsons, who was treating the leachate, could not handle ammonia levels exceeding 35 mg/l.

---

creates aluminum oxide and ammonia. The result is the production of heat and gases, primarily hydrogen and ammonia."  *Id*. at *5.  The Court found as follows, "The evidence is clear and convincing that the aluminum waste cannot be placed in municipal solid waste landfills . . . . The increased ammonia concentration also creates potential water treatment plant issues."  *Id*. a *14.

45.     Nevertheless, WSD and Waste Industries continued accepting industrial waste, including SAS, in large quantities and assuring Decatur County that it was operating the Landfill in a legal and responsible manner.

46.      After learning that WSD had been acquired by Waste Industries, the County inquired about and expressed concern about this new operator.

47.     In response, Waste Industries, Inc. made numerous representations to the County, TDEC, and citizens that it was not only operating the Landfill, but also doing so responsibly.

48.     For example, on July 5, 1999, Jim Beecher, Vice President of Waste Industries, Inc., wrote a letter to Decatur County Executive Wayne Odle regarding Waste Industries, Inc.'s acquisition of WSD as a wholly owned subsidiary.  Mr. Beecher stated, "Waste Industries will continue to administer the current disposal contract without interruption of services, or changes.  I can assure you we intend to provide the best services possible. . . The local management team is well qualified and dedicated to meeting your needs.  I have personally been associated with Waste Industries, Inc. since 1986 and can assure you that your contract is in good hands.  I will pay special attention to the host fee situation." *See* July 5, 1999 Letter from Waste Industries, Inc., attached as **Exhibit 6** (emphasis added).

49.     A few days later, WSD, through its Manager, Greg Elkins, sent a letter to the County and each of its Commissioners stating that the job it is doing "reflects pride in our professionalism and respect for the environment."  Mr. Elkins went on to state, "Waste Services of Decatur is now, and will continue performing at the highest level for the officials and residents of Decatur County."  *See* July 26, 1999 Letter attached as **Exhibit 7**.  Mr. Elkins gave the following assurances and representations regarding Waste Industries:

> I assured Mr. Odel [County Executive for Decatur County] the merger would only improve – not diminish – the ability of Waste Services of Decatur to perform the

contract due to <u>the vastly superior financial and industry strength of Waste Industries</u> in comparison to Waste Services of America.

\*\*\*

I understand the concern that the County has about knowing the people and companies it does business with. There are many and significant advantages for Decatur County with the current owners of Waste Services of Decatur. Most important is <u>the superior financial strength of Waste Industries. With over $200 million in annual sales, and market value of about $235 million, Waste industries provides the County with the long term financial stability and assurances of a well capitalized and well run public company. . . . Additionally, the safety and compliance track records of the company is simply outstanding. Waste Industries prides itself on its professional commitment to regulatory and safety compliance and has the track record to prove it.</u>

(emphasis added). This letter was provided to each of the County's Commissioners.

50.     Based upon these assurances and representations regarding Waste Industries, Inc., the County, Waste Services of Decatur, LLC and Waste Industries, Inc. entered into the First Amendment to the March 4, 1996 Agreement for Development and Operation of the Sanitary Landfill dated December 21, 2000, attached as **Exhibit 8**.

### *Waste Industries, LLC Becomes a Party to the Contract*

51.     Apparently ten days later, Waste Industries, Inc. assigned its membership interest in WSD to Waste Industries of Tennessee, LLC. Attached as **Exhibit 9** is an Instrument of Assignment and Transfer of Membership Interest in WSD from Waste Industries, Inc. to Waste Industries of Tennessee, LLC dated December 31, 2000.

52.     <u>Importantly, Waste Industries, Inc. did not assign or transfer any of its contractual obligations under the Contract as part of the December 31, 2000 assignment and transfer of membership interests in WSD to Waste Industries of Tennessee, LLC.</u> Nor did the County agree to any such an assignment or transfer nor release Waste Industries, Inc. from any of its obligations.

Therefore, Waste Industries, Inc. continued to be a party to the Contract, despite no longer holding membership interests in WSD.

53.     On March 31, 2001 Waste Industries, Inc. merged with a limited liability company and changed its name to Waste Industries, LLC.  *See* "Articles of Merger of Waste Industries, Inc. into Waste Industries Mergeco, LLC Which Changed Its Name to Waste Industries, LLC" March 30, 2001 (hereinafter the "Articles of Merger"), attached as **Exhibit 10**.

54.     Under the Articles of Merger, Waste Industries, Inc. merged into Waste Industries Mergeco, LLC, a North Carolina limited liability company.  Articles of Merger ¶ 1.  Pursuant to Paragraph 8 of the Articles of Merger, Waste Industries Mergeco, LLC changed its name to Waste Industries, LLC effective upon the consummation of the merger.

55.     Attached as an exhibit to the Articles of Merger is a "Plan of Merger and Reorganization."  Articles of Merger ¶ 3.  As part of the merger, Waste Industries, LLC f/k/a Waste Industries Mergeco, LLC assumed all "right, privileges, powers, immunities and franchises and all property of the Corporation [Waste Industries, Inc.], and shall be responsible and liable for all of the debts, duties, contracts, liabilities and obligations of the Corporation."  Plan of Merger and Reorganization, Art. III, Sec. 4.

56.     As a result of the merger, Waste Industries, LLC took the place of Waste Industries, Inc. as a party to the Contract, and Waste Industries, Inc.'s contractual obligations became those of Waste Industries, LLC.

### Waste Industries Continues Accepting SAS and Begins Using It as an Alternative Daily Cover at the Landfill

57.     Throughout 2001, WSD's and Waste Industries' customers continued their practice of requesting industrial waste approvals for the Landfill.   These industrial waste approvals included such items as soil contaminated with solvents and oil, wastewater lagoon sludge, gasoline

and diesel-contaminated soil and debris, buffer dust, petroleum hydrocarbon contaminated soil, and cleaning rags.   For each approval, TDEC made clear that the decision whether to actually accept the waste into the Landfill rested with the facility operator. *See, e.g.* Special Waste Permit, attached as **Exhibit 11**.

58.     By 2002, WSD and Waste Industries accepted industrial waste from facilities across the region and country.

59.     Sometime in 2002 and continuing thereafter, WSD and Waste Industries began a practice of recirculating leachate at the Landfill.  While the practice is not uncommon at a typical Landfill, recirculating leachate on cells with SAS mixed with combustible waste is akin to throwing logs on a fire.  This practice was becoming known in the Landfill industry as a high risk and dangerous practice that exacerbates the chemical reaction between the SAS and nearby combustible materials (anything else in the waste pile), which can create a chemical "cooking" effect and unsafe high temperatures in the waste pile.

60.     On May 6, 2002, Tennessee Aluminum Processors, Inc. in Columbia, Tennessee sought approval to send more SAS to the Landfill.

61.     Despite the fact that WSD and Waste Industries knew or should have known about the harm of SAS and could have researched the predictable chemical reaction of SAS upon review of the special waste approval letters, WSD and Waste Industries agreed to use SAS, including black dross/slag, generated from Tennessee Aluminum Processors as an alternative daily cover at the Landfill.  This plan invited mixing rainfall with this waste, which is known to combust or ignite and react when in contact with moisture or water.

62.     Tennessee Aluminum Processors had amassed a stockpile of SAS on its property, and the TDEC's Office of Water Management, Division of Water Pollution Control found in 1989

that water run-off from the SAS stockpile was killing surrounding vegetation.  The Division of Water Pollution Control additionally found that the nearby creek exhibited a "total absence of aquatic organisms."  TDEC'S findings are reflected in the 1989 Agreed Order attached hereto as **Exhibit 12**.

63.    Pursuant to the 1989 Agreed Order, Tennessee Aluminum Processors was cited for various violations of Tennessee environmental laws and ordered to prevent rainfall from coming into contact with the SAS.

64.    After receiving further citations from TDEC, Tennessee Aluminum Processors eventually sought a location where it could move the problematic stockpile of SAS.

65.    In late 2001 and early 2002, Waste Industries and WSD were approached by Tennessee Aluminum Processors to discuss moving the SAS stockpile to the Landfill.  By this point, Tennessee Aluminum Processors had 118,750 cubic yards of SAS sitting at its plant in Mt. Pleasant and desired to dispose of it in the Landfill.

66.    Waste Industries and WSD agreed not only to accept the SAS stockpile into the Landfill, but designed a plan whereby they would use SAS as an alternative daily cover, meaning that the SAS would be spread in layers over the other waste in the Landfill.

67.    According to an Alternative Daily Cover 90-Day Trial Period Report (the "Report") produced by "Waste Services of Decatur, LLC, A Waste Industries Co.," dated November 11, 2002 (attached without exhibits as **Exhibit 13**), "The project goal is to move 2000 tons per month [of SAS], which is approximately equivalent to 2000 cubic yards.  It is the intent of the landfill to utilize this material as alternative daily cover.  At this rate, the project will move the entire stockpile in approximately 60 months.  The daily goal will be to move approximately 100 tons per day."

68.     According to the Report, the Landfill received 2,031.20 tons of SAS in August 2002, 1,961.58 tons in September 2002, and 1,971.17 tons in October 2002, for a total of 5,963.95 tons of SAS stockpile during the trial period.

69.     The Report states that the project was "extremely successful," despite a spill of 100 gallons of leachate on August 28, 2002.  The Report admits that samples collected of the spilled leachate showed "somewhat higher ammonia and TDS."  The Report also admits that "Sediment Pond C does show higher levels of ammonia and chloride from the day-to-landfilling activity of Cells 3 B&C."

### The Ammonia Levels in the Landfill Leachate Skyrocket After the Alternative Daily Cover Experiment and Parsons Can No Longer Treat the Leachate

70.     In November 2002, the City of Parsons was treating the leachate from the Landfill at its wastewater treatment facility.  Parsons carefully monitored each load from the Landfill as well as the lagoons at its wastewater treatment facility during that month.  Parsons found that the ammonia levels in the leachate samples from the Landfill ranged from 493 to 1672 mg/l.  At the time of entering into the Contract, WSA and its successor entities and subsidiaries knew or should have known that the City of Parsons could only handle leachate if the ammonia levels did not exceed 35 mg/l.

71.     Within two weeks of the SAS alternative daily cover trial period ending, Parsons observed the ammonia levels of the leachate from the Landfill jump from 493 mg/l on November 4, 2002 to 1,502 mg/l on November 11, 2002.  From November 13, 2002 to November 25, 2002, the ammonia levels of the leachate never fell back below 1,000 mg/l, as evidenced by testing performed by the City of Parsons, attached as **Exhibit 14**.

72.     In a letter dated January 2, 2003, Timothy Boaz, the Mayor of Parsons, informed the Tennessee Division of Water Pollution Control that Parsons had attempted to treat leachate

from the Landfill, but that due to the high ammonia levels, its facility could not handle the leachate. Mayor Boaz stated, "We noticed a jump in the Ammonia at the end of November. We immediately stopped them from using our system when we observed the problem. We have notified them that we can no longer take their leachate until this problem can be addressed." The January 2, 2003 Letter is attached as **Exhibit 15**.

73.     It is unclear what, if anything, WSD and Waste Industries did to dispose of and treat their leachate from the Landfill after January of 2003.

***Despite the Jump in Ammonia After the 90-Day SAS Trial Period and the Warning from Parsons, Waste Industries Accepts the Remainder of the SAS Stockpile***

74.     In October 2003, TDEC and Tennessee Aluminum Processors entered into another Agreed Order in 2003, which is attached hereto as **Exhibit 16**, permitting Tennessee Aluminum Processors to move the SAS stockpile to the Landfill or another suitable solid waste disposal facility.

75.     TDEC relied upon the Report produced by Waste Industries in permitting the SAS stockpile to be moved to the Landfill, stating that the Report showed no adverse impact on the leachate at the Landfill.

76.     It does not appear that Waste Industries ever amended the Report to reflect the jump in ammonia in the leachate observed by Parsons or otherwise notified TDEC of this adverse development.

77.     Despite the fact that Waste Industries was on notice of the jump in ammonia in the leachate and Parsons' inability to treat the leachate, Waste Industries decided to accept the SAS stockpile. Upon information and belief, Waste Industries accepted the SAS stockpile from 2002 to 2012.

78. Other problems continued at the Landfill during this time.  On November 2, 2003, a fire broke out at the Landfill.  Soon thereafter, the leachate tank had a leak at some point in 2003, as stated in TDEC's December 8, 2003 inspection notes.

79. Waste Industries continued to accept other industrial waste as well during this time, despite the apparent and ongoing chemical reaction of the SAS producing unusually high levels of ammonia in the leachate.  Even the waste water sewer sludge generated by Metro Water and Sewer in Nashville was being deposited into the Landfill beginning in 2005.  Other customers in 2005 and 2006 disposed of welding sludge, diesel-contaminated soil, SAS, and asphalt cement.

80. At all times, Waste Industries and WSD remained obligated by solid waste regulations to review the special waste information and determine that accepting it was compatible with other wastes, and would not risk permit violations or the inability to meet all requirements of the law, such as collecting and disposing of leachate lawfully.

### *Waste Industries Leans on Parsons and Decaturville to Treat Its Leachate, But Fails to Provide Samples to Enable Ammonia Sampling*

81. In March 2007, Waste Industries contacted the Mayors of Parsons and Decaturville to discuss the treatment of leachate from the Landfill.  In letters dated March 20, 2007 to Mayor Boaz of Parsons and Timothy Grace, Mayor of Decaturville, Waste Industries complained that it was not receiving free leachate disposal from either Parsons or Decaturville.  Referring to the 1996 Contract, Waste Industries stated that "when the agreement was established it was envisioned by all parties that leachate from the Landfill would be disposed of at no cost to the Decatur County Landfill at either the Town of Parsons or Town of Decaturville wastewater treatment facilities in exchange for free disposal of solid waste from these two municipalities."  Copies of the March 30, 2007 Waste Industries letters to Parsons and to Decaturville are attached hereto as **Exhibit 17**.

82.     In its letters, Waste Industries warned the Mayors that if free leachate disposal was not provided, it would "be forced to begin charging for the disposal of solid waste from these municipalities," to begin on July 1, 2007.  Waste Industries goes on to state "our preference would be to continue to receive this waste at no disposal cost and simply enjoy the no cost leachate disposal that has been previously agreed to."

83.     The City of Parsons responded via letter shortly thereafter on August 29, 2007, a copy of which is attached hereto as **Exhibit 18**.  The letter was sent by Parsons' engineering firm, TLM Associates, Inc., whose task was to represent and assist it "toward a goal of allowing wastewater from Waste Services of Decatur Co. (WSDC) into the City of Parsons Sewer System at the POTW."  TLM explained that if the leachate could meet the requirements of Parson's pretreatment program, a test load of leachate could be initiated.  If the wastewater quality did not meet the standards, then the wastewater could not be allowed at that time.  The City requested an application for a Major Industrial Discharge Permit from WSD including sampling results of a representative sample.  TLM advised, however, that it appeared "that pretreatment will be a requirement in order to reduce the strength of the leachate to a level acceptable for the Parsons Wastewater facility."  TLM reiterated that "[o]nce the leachate is determined to meet Sewer Use Ordinance and Pretreatment Program requirements then the City is ready to accept the leachate wastewater, (approximately +/- 20,000 gallons/day)."  TLM included a copy of Parson's Pretreatment Program Compatible Pollutants List and Limits, which reiterated that it could handle ammonia not to exceed 35 mg/l.

84.     Upon information and belief, neither Waste Industries nor WSD ever responded to TLM's request for them to submit an application for a Major Industrial Discharge permit and sampling results of a representative sample of leachate.

85. Over the next several years, Waste Industries and WSD continued to accept waste from Parsons and Decaturville without requiring leachate disposal in return.

### Waste Industries Assures TDEC and the County that it is Operating the Landfill Responsibly and There are No Problems with the Leachate

86. On April 20, 2010, the Tennessee Division of Air Pollution Control held a public hearing for citizens of Decatur County regarding WSD's request for an operating permit issued under Title V of the Clean Air Act.[4]

87. Representatives from Waste Industries attended the hearing. As official hearing notes by the Tennessee Division of Air Pollution Control attached hereto as **Exhibit 19** show, David Pepper, Area Manager for Waste Industries in Raleigh, North Carolina, provided a "corporate management perspective" of Waste Industries, the "parent organization of WSD."

88. According to the hearing notes, "Parent company Waste Industries personnel and respective persons acting on behalf of the landfill were introduced by Mr. Pepper." Mr. Pepper discussed how "Waste Industries operates in 7 states and has 36 collection stations, 30 waste transfer stations, 10 landfills, 72 waste convenience sites, and 11 recycling centers." Mr. Pepper testified that "[t]he entity Waste Services of Decatur, LLC (WSD) is a subsidiary of Waste Industries" and that "Waste Industries who [sic] had been in business for 40 years."

89. During the hearing, Decatur County residents raised concerns over operations at the Landfill, including leachate management. Several citizens described a haze and smell around the Landfill that caused them to feel sick, caused headaches and stomach aches, and made their eyes burn.

---

[4] "Under Title V of the Clear Air Act, every 'major source' of air pollution must obtain an operating permit from a state agency that identifies each air-quality restriction that applies to the source." *Sierra Club v. United States EPA*, 557 F.3d 401, 403 (6th Cir. Feb. 26, 2009).

90.     Mr. Pepper represented to the County at the hearing that the leachate at the Landfill

was being well managed and that there were no issues with the Landfill's leachate or its treatment:

> We heard concerns about leachate
> management practice. Kim Frederick [Landfill Manager] talked
> about sending the leachate to a permitted
> facility in Jackson. That is not unusual and
> this is the most commonly practiced
> disposal methodology across the country.
> The hauler is a licensed hauler for that type
> of product. Some have suggested that we
> should recirculate that leachate back into
> the landfill rather than haul it. One should
> understand that this facility is somewhat
> small and it would not take very long for the
> amount of waste at this facility to become
> saturated. That creates all sorts of
> operational issues with leachate and it
> increases the rate that gas becomes
> generated at the landfill. One of the lacking
> items that the bacteria or organisms needs
> is water in order to survive. They need food
> and water. So when you pump the water
> back into the landfill you fill that void and
> that creates that degradation process and
> that can create a problem with regard to
> odors.

91.     Mr. Pepper assured the County citizens that Waste Industries was taking steps to

ensure that no leachate leaked out of the Landfill nor affected any ground or surface water in the

County, stating:

> There were concerns first of all about GW
> and surface water protection. We have
> already talked about that this evening and
> the design of a liner system and the
> mechanisms used to prevent leachate into
> the environment. I want to point that these
> methodologies have worked and we expect
> them to continue to work. These methods
> are proven over time, not only here but in
> lots of other places and our experience tells
> us that they will continue to work. It does

not surprise us and it is what we really
expect.

***Leachate Management and Ammonia Levels Continue to Be Problematic at the Landfill***

92.     High spiking ammonia is a signature of SAS, which Waste Industries and WSD
knew or should have known.

93.     This predictable chemical reaction was exacerbated by Waste Industries and WSD
mixing the SAS with innumerable other types of caustic, toxic and potentially hazardous industrial
special wastes, by using SAS as a daily cover, by recirculating leachate, and by failing to
adequately cover the waste.

94.     The effects of Waste Industries' and WSD's years of accepting SAS and failing to
properly control it is evidenced by the ensuing leachate management issues and out of control
ammonia levels.

95.     On June 21, 2011, after an inspection of the Landfill, TDEC cited the operator for
three major violations related to its leachate disposal, including inadequate maintenance of its
leachate management system, inadequate leachate collection system, and leachate observed
leaking at the site.  TDEC stated, "It has been determined no leachate has been transported off-site
for treatment since February of 2011.  All the leachate since this time has been re-circulated back
through the Landfill which may be contributing to the leachate problem.  Failure to adequately
maintain the leachate collection removal system constitutes a violation of Tennessee Code
Annotated 68-211-104(3) and Rule 1200-1-7.04(4)(a) 7 of the Rules of Tennessee Department of
Environment and Conservation, Division of Solid Waste Management."  A copy of TDEC's June
21, 2011 letter is attached as **Exhibit 20**.

96.     On June 24, 2011, Geosyntec Consultants, an engineering and consulting firm in
Kennesaw, Georgia, sent a letter to TDEC on behalf of WSD.  A true and correct copy of the June

24, 2011 letter is attached as **Exhibit 21**.  WSD had requested a modification to its permit for the

Landfill in order to construct and operate a leachate pretreatment system at the Landfill.  Senior

Engineer Nelson L. Breeden authored the letter and explained how the type of waste that WSD

and Waste Industries had been accepting at the Landfill was causing elevated ammonia levels in

the leachate:

> Geosyntec understands that the landfill had previously accepted non- (or partially-
> ) reacted aluminum salt cake (sometimes referred to as "Aluminum Dross") that
> has likely contributed to the currently observed elevated concentrations of ammonia
> nitrogen (NH3-N) and salinity in the landfill leachate.  Elevated NH3-N
> concentrations appear to be the main issue for leachate acceptance and treatment at
> relatively nearby WWTPs [wastewater treatment plants].  Due to the elevated NH3-
> N concentrations JEA [Jackson Energy Authority] recently stopped accepting the
> leachate, which JEA believes may have contributed to their challenges meeting
> NH3-N limits in their treated effluent.  As a consequence, the facility is currently
> forced to re-circulate part of their leachate back into the landfill in order to prevent
> the storage tank from overflowing.

97.     On June 29, 2011, Waste Industries, through Mr. Pepper, responded to TDEC's

June 21, 2011 notification of violations.  A copy of Waste Industries' June 29, 2011 letter is

attached as **Exhibit 22**.  Waste Industries confirmed that no leachate had been hauled from the site

since February 2011 and that it was recirculating daily generated leachate back into the Landfill.

Waste Industries explained, "[b]y way of background, the reason for failure to haul leachate from

the site since February 2011 was that the ammonia levels in the leachate become [sic] problematic

for the treatment plan we had been utilizing for disposal."  Waste Industries stated that while it

was recirculating its leachate, a pump malfunctioned, causing leachate to reach a storm water pond.

Waste Industries assured TDEC that it was designing a long-range plan to get the ammonia levels

under control and use the previous treatment plant as a disposal facility again.  As Waste Industries

stated, "we began looking into a longer range plan to pre-treat leachate at the  landfill so as to be

able to utilize the previous treatment plant in Jackson as a disposal facility again."   Waste

Industries further stated that it was searching for an alternative off-site treatment facility for its leachate, but that the search was unsuccessful. Waste Industries also stated that it was in contact with a facility in Nashville that might be able to receive some of the leachate for treatment and disposal, which "will reduce the amount of leachate being recirculated back into the landfill."

98. On July 11, 2011, TDEC approved plans to build lined leachate treatment and aeration ponds on the west side of the Landfill footprint, near Buck Branch. Upon information and belief, Waste Industries built these ponds in 2011.

99. On September 28, 2012, John M. Gardner, P.E. of Smith Gardner, Inc., an engineering firm in North and South Carolina, sent a letter to TDEC on behalf of the operator, a true copy and correct copy of which is attached as **Exhibit 23**. Through this letter, WSD and Waste Industries sought to further modify its leachate pretreatment system at the Landfill, stating that the existing system approved in 2011 was ineffective to bring the ammonia levels down to levels that were treatable for local publically owned treatment works or wastewater treatment plants.

100. During a facility evaluation conducted by TDEC on March 7, 2013, it was noted that the revised leachate pretreatment system would be operational around March 15, 2013. On April 5, 2013, TDEC visited the Landfill and noted that the pretreatment system was only "partially running."

101. On or about June 12, 2014, TDEC conducted a site inspection and noted that leachate was overflowing from the treatment ponds. A true and correct copy of the TDEC Trip Report is attached as **Exhibit 24**. TDEC followed up with a letter dated June 13, 2014, requesting water samples from nearby Buck Branch, a northerly flowing tributary of Whites Creek. A true and correct copy of the TDEC June 13, 2014 letter is attached as **Exhibit 25**.

*Waste Industries Continually Holds Itself Out as Being Involved in Landfill Operations*

102.    Throughout the activities described above, and in addition to being a party to the Contract, Waste Industries has continually represented that it is involved in Landfill operations and is associated with WSD.

103.    First and foremost, visitors to the Landfill are greeted with the following sign when they enter the Landfill property:



(Picture of sign taken on April 19, 2017).  As this sign shows, Waste Industries holds itself out to the public as operating the Landfill, separate and apart from WSD.

104.    As recently as April 2017, when members of the public visited WSD's Facebook page for the Landfill, they were referred to Waste Industries' website at www.wasteindustries.com.

105.    Consistent with Waste Industries' declaration on the Landfill sign, Waste Industries has continually represented to the County and to the state of Tennessee that it is involved in Landfill operations and is associated with WSD.  To illustrate but a few examples:

      a)    On June 29, 2011, Waste Industries responded to a citation by the Tennessee Department of Environment & Conservation ("TDEC") against WSD for violations relating to leachate at the Landfill.  The letterhead used in the response states "Waste Industries" and refers TDEC to "www.wasteindustries.com."  WSD was copied on this letter.  Waste Industries uses "we" to discuss operations at the Landfill by WSD and Waste Industries, stating for example: "First of all we began recirculating daily generated leachate back into the landfill . . . ."  *See* Exhibit 20 above.

b)      Golder Associates, Inc., an environmental consulting firm retained by WSD and Waste Industries, has sent *numerous* letters to TDEC's Division of Solid Waste Management over the years regarding water quality monitoring at the Landfill.  In its letters, Golder states that WSD is a subsidiary of Waste Industries USA, Inc., which is the parent company of Waste Industries, LLC.  Waste Industries USA, Inc. is  copied on these letters, a representative sample of which is attached as **Exhibit 26**.

c)      On June 24, 2011, Geosyntec Consultants submitted a minor modification permit application to TDEC on behalf of WSD.  In that application, Geosyntec represented that WSD was a subsidiary of Waste Industries, Inc.  *See* Exhibit 19 above.

d)      On September 28, 2012, John M. Gardner, P.E. of Smith Gardner, Inc., an engineering firm in North and South Carolina, sent a letter to the Tennessee Division of Air Pollution on behalf of WSD.  In his letter, he represents that WSD is a subsidiary of Waste Industries, Inc.  *See* Exhibit 21 above.

e)      Waste Industries has sent email correspondence as recently as February 22, 2016 to TDEC regarding operations at the Landfill.  In the email attached as **Exhibit 27**, George Metcalf, who identifies himself as a General Manager at Waste Industries, sent an email to TDEC discussing litter at the Landfill.  Mr. Metcalf's email address is george.metcalf@wasteindustries.com.

f)      Letters to the County regarding termination of the Contract are on the letterhead of Waste Industries and were sent by the Vice President and General Counsel for Waste Industries.  *See* Exhibit 3 to Plaintiff's Complaint.

g)      Even in a recent Tennessean article published in May 1, 2017, attached hereto as **Exhibit 28**, the CEO of Waste Industries, Ven Poole, discusses Landfill operations and states, "The dispute is entirely financial.  My company does not take our obligations lightly."

106.    As these examples show, Waste Industries, its agents, and representatives have sent a clear and consistent message to the citizens of Decatur County and to the state of Tennessee that Waste Industries continues to be involved with Landfill operations.

### Waste Industries is Involved in Landfill Operations and Management and has Financial Ties to the Landfill

107.    In addition to making the representations described above as to Waste Industries' financial power and backing of the Landfill, Waste Industries is involved in Landfill management and operations and has financial ties to the Landfill.

108.    TDEC Jackson Field Office records identify WSD, Waste Industries, and Waste Industries USA, Inc., the parent of Waste Industries, LLC, as entities bearing financial responsibility for the Landfill.  For example, the November 20, 2013 Landfill Performance Bond lists the Principal as "Waste Services of Decatur, LLC C/O Waste Industries, LLC."  Under the signature block for the Performance Bond, the signor is Stephen Grissom, who is Chief Financial Officer of Waste Industries.  *See* Financial Responsibility Document, attached hereto as **Exhibit 29**, Performance Bond, attached hereto as **Exhibit 30**, and Screen Shot from https://wasteindustries.com/about/executives, attached hereto as **Exhibit 31**.

109.    Waste Industries operated under the Contract by directly paying the Host Fees to the County pursuant to Article Six of the "Agreement for Development and Operation of the Sanitary Landfill."  Attached as **Exhibit 32** is a recent payment of Host Fees by Waste Industries, LLC.  Both the check and the accompany invoice clearly identify "Waste Industries, LLC" as the entity paying these Host Fees.

110.    Waste Industries is involved in the financial management of the Landfill, providing financial oversite and support to WSD.

111.    Upon information and belief, Waste Industries pays for certain expenses relating to the Landfill, such as engineering, construction, infrastructure, equipment, and extraordinary expenses.

112.    Waste Industries has also paid third parties for hauling and treatment of leachate from the Landfill.

113.    Upon information and belief, Waste Industries provides various other services with respect to the Landfill, such as hiring, management, personnel, and human resources.

*After Fifteen Years of Accepting and Profiting from Special Waste, and Creating an Ongoing Chemical Reaction Producing Uncontrolled Ammonia in Leachate, Waste Industries and WSD Seek to Abandon the Landfill Because the Special Waste is Apparently Less Profitable Than They Intended*

114.    From 1990 to 2010, the County's population remained steady at 10,472 per the 1990 US Census compared to 11,757 per the 2010 US Census.  In fact, the County's population may have decreased since 2010, going down to 11,660 per the 2015 US Census Population Estimates Program.

115.    In stark contrast to these numbers, the amount of leachate generated at the Landfill has skyrocketed under the control of Waste Industries and WSD.

116.    Again, from April – July 1995, the County generated only 68,400 gallons of leachate from the Landfill for treatment by Decaturville.  In contrast, Waste Industries and WSD have operated the Landfill in such a way as to generate millions of gallons of leachate each year. In 2009, for example, Waste Industries and WSD have caused as much as 7,516,257 gallons of leachate to be generated at the Landfill.

117.    Despite creating a toxic environment at the Landfill, resulting in leachate with such high ammonia levels that it could not be handled by Parsons' wastewater treatment facility, and despite generating millions of gallons of leachate per year, well over historic levels pre-dating Waste Industries' and WSD's operations, Waste Industries and WSD have taken the position that the County has breached the Contract because neither Parsons nor Decaturville can handle the leachate.

118.    Waste Industries and WSD have stated an intention to abandon the Landfill without fulfilling their obligations to operate the Landfill until 2026 nor its obligations for closure and post-closure in accordance with Section 4.3 of the Contract. *See* November 8, 2016 letter from Waste Industries to the County, attached as Exhibit 3 to the Complaint.

119.    Waste Industries and WSD created the circumstances by which it became impossible for Decaturville or Parsons to treat the leachate from the Landfill without effective pre-treatment or other steps to bring the ammonia levels down to levels consistent with levels at the inception of the parties' Contract.  Waste Industries and WSD are using the impossible situation that they created and their failure to effectively pretreat the leachate or otherwise get the ammonia levels under control as a pretext to walk away from the Landfill without taking responsibility for cleaning up the site or fulfilling its post-closure responsibilities.

120.    Waste Industries and WSD have waived any right to enforce provisions relating to leachate disposal or hauling in exchange for free trash disposal from Parsons or Decaturville.

121.    After years of waiving these rights, Waste Industries and WSD asserted its position regarding "breach" of the parties' Contract for the first time against the County in 2015.

122.    In a letter from counsel dated December 5, 2016, the County made clear that it rejected WSD/Waste Industries' notice of termination.  A true and correct copy of the December 5, 2016 letter is attached as **Exhibit 33**.

### *The County Discovers Environmental Violations at the Landfill*

123.    After learning of the intent to abandon the Landfill, the County became concerned that there may be other reasons that Waste Industries and WSD seek to abandon the site despite nine years remaining on the agreement.  The County collected and analyzed water samples from the Landfill and made a preliminary review of TDEC records.  At a minimum and before a more detailed investigation, the County identified the following violations of law and breaches of Sections 3.4 ("Representations and Warranties of WSA, Compliance with Laws") and 4.1(c) ("Operation of the Landfill, Compliance with Laws") of the Contract, which requires Waste

Industries to comply all federal, state, regulatory laws and the terms of the solid waste or other permits governing the Landfill operation:

a)      The Landfill openly leaks leachate from various location above and below ground near Cell 3, which drain to a surface waters and out to Buck Branch.  Buck Branch borders the landfill along the eastern boundary. Cell 3 was observed on a sunny day in February to be draining leachate filled with acutely high levels of ammonia, aluminum and some arsenic and cyanide.  A side stream receiving the drainage full of erosion sediment, and apparently lacking any aquatic or benthic life.  The condition constitutes and impaired or polluted stream, indicates an off-site and unpermitted discharge of leachate and violates Federal and State law.  More particularly, it constitutes an "Open Dump" condition as defined in 42 U.S.C. § 6903 and 40 C.F.R. § 257 and 258 and violates 42 U.S.C. § 6943 and 40 C.F.R. § 257, which prohibit the discharge of pollutants, including liquids from solid waste, (leachate) from an "Open Dump," as that term is defined under 40 CFR §§ 257.1 and 257.2.

b)      Any landfill facility or practice at the facility – such as mixing SAS with municipal waste that is improperly managed – that violates the criteria set out in 42 U.S.C. § 6944 poses a reasonable probability of adverse effects upon human health and the environment.  Open and ongoing discharges of toxic leachate to surface waters that the public can access and that kills/significantly impairs aquatic life meets that standard of "adverse effects."

c)      The open leaking of leachate full of ammonia and metals to surface waters of the State further violates the Federal Clean Water Act, including 33 U.S.C. § 1311(a) and 40 C.F.R. § 122.21, which prohibit the discharge of pollutants to any jurisdictional

waters without a permit to do so.  Waste Industries and WSD have no such permit.  There is no permit available for discharging landfill leachate of this type to surface streams.

       d)      Waste Industries and WSD have violated the state solid waste regulations by admittedly discharging "statistically significant" increased levels of pollutants into the groundwater passing through and off the Landfill site.  Twice yearly monitoring of groundwater wells at the site have established leaking of the Landfill such that the site is in "detection monitoring," which requires additional and more expensive compliance and monitoring measures.  Like Federal Law, State regulations do not allow landfills to discharge their waste, below or above ground, to any area beyond the permit boundary. "Detection Monitoring" typically means the site is beginning to leak.  It bears increased monitoring costs for the landfill operator and can quickly progress to a condition requiring "corrective action" or generate state ordered increased monitoring or additional wells.

       e)      A stream along the southeastern boundary of the Landfill feeding Buck Branch was sampled and revealed to have elevated levels of ammonia, aluminum, and heavy metals such as barium, copper, and nickel consistent with drainage from SAS waste. The stream was apparently devoid of all forms of life commonly found in normal stream conditions.  It is a violation of Tennessee law, Tenn. Code Ann. § 69-3-114, for Waste Industries and WSD to discharge leachate into the waters of the state, including the southeastern tributary to Buck Branch and Buck Branch, where such leachate can damage or kill aquatic life, and or render the stream substantially unusable for recreation, fishing or irrigation.

       f)      Waste Industries and WSD have further violated Tenn. Code Ann. § 69-3-114(b) by violating Tenn. Code Ann. § 69-3-108(b), which prohibits discharging leachate

to waters of the state and altering the chemical and biological properties. These laws make it unlawful to violate the solid waste permit terms, which also prohibit discharges of leachate/solid waste off site. It is further a violation of Sections 114 and 108 to violate any water quality standard by rendering one nearby stream apparently devoid of life and the other substantially devoid of aquatic life downstream of the Landfill impact.

g)      Site observations in February 2017 and thereafter indicate a history of excessive and toxic levels of ammonia in leachate discharging to open area ponds, stormwater ponds and spilling directly into a side stream and to Buck Branch. A scorched swath of land with no vegetation visibly indicates the path of leachate mixed with stormwater flowing directly from the landfill site into Buck Branch. Open discharge of leachate or leachate mixed with stormwater to waters of the State is prohibited by the regulations and the damaging effects are prohibited by the above statutes.

h)      Waste Industries and/or WSD paid a local trucking company, B&T Hauling, LLC to haul leachate off-site which was later found in the Spring of 2016 to have been repeatedly dumped (over a period of months) along the highway and into the yard of a resident of Camden, Tennessee and at various other locations in violation of civil and criminal statutes prohibiting the illegal dumping of toxic leachate. Attached as **Exhibit 34** is a letter from TDEC to B&T Hauling dated June 17, 2016, in which TDEC details this illegal dumping of leachate from the Landfill. TDEC notes that the ammonia level in the leachate was 1,000 mg/l. TDEC further states, "Improper disposal of landfill leachate can potentially impact public health, soil, groundwater, and surface water."

124.    The conditions observed at the streams apparently devoid of the healthy aquatic life found upstream from the landfill drainage constitutes a public nuisance pursuant to Tenn. Code

Ann. § 69-3-114.  Groundwater discharges of leachate further constitute a nuisance and violate state and federal law and permit limits.

125.     On April 12, 2017, the County sent both Waste Industries and WSD detailed Notice of Intent to Sue under the Citizen Suit provisions of the Solid Waste Act/Resource Recovery and Conservation Act, ("RCRA") and the Clean Water Act which impose strict liability and federal penalties up to $25,000.00 per day for the violations recounted in the Notice.  Those violations include the ones detailed hereinabove as well as others.  These claims will be amended to add those violations and claims, which include the recovery of reasonable attorney fees and costs, when the statutory notice period expires and if the violations continue.

### Claim One – Declaratory Judgment

126.     All allegations set forth above are incorporated by reference as if fully set forth herein.

127.     The Contract is a valid agreement between Waste Industries, WSD, and the County.

128.     The County has performed all of its obligations under the Contract.

129.     On November 8, 2016, Waste Industries, through its Senior Vice President and General Counsel, Lisa D. Inman, gave notice to the County of Waste Industries' and WSD's intent to terminate the parties' Contract.  *See* November 8, 2016 Letter from Waste Industries, attached as Exhibit C to the Complaint.  This letter is on Waste Industries' letterhead, and Waste Industries speaks in terms of "we" and "our" when discussing the Contract.

130.     In its November 8, 2016 letter, Waste Industries takes the position that the County breached the Contract and failed to cure after Waste Industries, through Ms. Inman, sent a notice of breach to the County on December 15, 2015.  In the December 15, 2015 letter, which is also sent on Waste Industries' letterhead, Waste Industries takes the position that the County breached

the Contract because it has not treated or paid for treatment of the leachate from the Landfill.  (A copy of this letter is not being made an exhibit at this time, due to concerns regarding settlement discussions in the letter.  Counsel for the County may seek to introduce a redacted version of the letter into the record at a future point).

131.     Following Waste Industries' letters to the County, WSD filed suit seeking permission to abandon the Landfill, without performing closure and post-closure obligations under Section 4.3 of the Contract, and to have no further financial obligations relating to the Landfill, including to have the performance bond released on which both Waste Industries and WSD appear to be jointly responsible.  *See* Complaint, Prayer for Relief A and Exhibit 28.

132.     Waste Industries and WSD created the circumstances by which it became impossible for Decaturville or Parsons to treat the leachate from the Landfill without effective pre-treatment or other steps to bring the ammonia levels down to levels consistent with levels at the inception of the parties' Contract.  WSD and Waste Industries are using the impossible situation that they created and their failure to effectively pretreat the leachate or otherwise get the ammonia levels under control as a pretext to walk away from the Landfill without taking responsibility for cleaning up the site or fulfilling its post-closure responsibilities.

133.     The County respectfully requests that this Court consider the agreement between the parties, the representations of WSD, Waste Industries, and their agents, the communications between the parties and with third parties, the course of conduct among the parties, and the actions of WSD and Waste Industries to declare the rights and obligations of the parties with respect to the parties' Contract.

134.     Specifically, the County requests that this Court declare the following with respect to Waste Industries:

a)     that the term of the parties' Contract continues until 2026;

b)     that the County has fulfilled all obligations under the Contract, despite assertions by Waste Industries;

c)     that the Contract does not require the County to pay for leachate removal or disposal from the Landfill, as Waste Industries has asserted;

d)     that the manner in which Waste Industries and WSD operated the Landfill caused the leachate at the Landfill to generate millions of gallons of leachate with highly elevated ammonia levels, making it impossible for a municipal wastewater treatment facility, such as Parsons', to treat this leachate;

e)     that Waste Industries and WSD failed to take reasonable steps to effectively pretreat the leachate or otherwise get the ammonia under control such that it could be treated by a municipal wastewater treatment facility;

f)     that even if the facts were that Waste Industries and WSD had not wrongfully used the Landfill for SAS disposal and the leachate were capable of being treated by Parsons or Decaturville, the only remedy for failure to treat or dispose of leachate on a free basis would be the discontinuation of free residential disposal to Parsons or Decaturville;

g)     that, to the extent Waste Industries was entitled to free leachate treatment/disposal under any conditions, it waived the right to sue for breach and to receive damages after failing to raise the objection for over a decade; and

h)     that there is no legal basis to release the performance bond on which Waste Industries' name appears.

### Claim Two– Public Nuisance

135.    All allegations set forth above are incorporated by reference as if fully set forth herein.

136.    Waste Industries has held itself out as being involved with WSD, often making representations that WSD is its wholly-owned subsidiary.  Waste Industries often speaks on behalf of WSD when addressing issues related to the management and operations of the Landfill.

137.    Waste Industries has represented to the County, to Tennessee regulatory agencies, and to the public at large that it operates the Decatur County Landfill or is involved in operations alongside WSD.

138.    Waste Industries has cited its company history and financial status to provide assurances to the public and to the County that it is operating the Landfill in an environmentally responsible way.

139.    Waste Industries is involved in the financial management of the Landfill, providing financial oversite and support to WSD.

140.    Upon information and belief, Waste Industries pays for certain expenses relating to the Landfill, such as engineering, construction, infrastructure, equipment, and extraordinary expenses.

141.    Upon information and belief, Waste Industries provides various other services with respect to the Landfill, such as hiring, management, personnel, and human resources.

142.    High spiking ammonia is a signature of SAS, which Waste Industries and WSD knew or should have known.  This predictable chemical reaction was exacerbated by Waste Industries and WSD mixing the SAS with innumerable other types of caustic, toxic and potentially hazardous industrial special wastes, by using SAS as a daily cover, by recirculating leachate, and by failing to adequately cover the waste.

143.    The effects of Waste Industries' and WSD's years of accepting SAS, using it as a daily cover, and failing to properly control it is evidenced by the ensuing leachate management issues and out of control ammonia levels.

144.    As a result of both accepting SAS and using SAS as an alternative daily cover, Waste Industries, either itself or in concert with or through WSD, its apparent agent, has created a

toxic environment on and off the Landfill boundary resulting in openly draining leachate, discharges to surface streams and with captured leachate with such high ammonia and or heavy metal levels that it could not be handled by local wastewater treatment facilities.

145.    The County owns the land on which the Landfill waste footprint sits and the wider, total site footprint.  Approximately 7 acres of land on the western most side of the site does not have waste but has been converted by Waste Industries, either itself or in concert with or through WSD, its apparent agent, to leachate drainage, stormwater runoff, and thick streams of dried and eroded mud.

146.    Waste Industries, either itself or in concert with or through WSD, its apparent agent, repeatedly made unreasonably dangerous and illegal operational decisions that allow leachate full of toxic ammonia, aluminum, and other heavy metals, among other polluting constituents, to openly flow through the site acreage on the west side to streams.  These conditions have created a public nuisance.

147.    In June of 2014, state officials inspecting the Landfill documented overflowing leachate treatment ponds that dumped into stormwater ditches in this same area and just yards from Buck Branch.  The state inspector at that time, responding to an anonymous complaint, documented "visual evidence of leachate all along the course of the stormwater ditch until it reached the stormwater basin" and that "there was evidence of a leachate release" at the corner of a polishing pond next to Buck Branch.

148.    Again in February of 2017, open leachate was tested and observed during a site visit at which the County Mayor was present.  Leachate was leaking from a cell near 3B, down an open drainage ditch and into the same stormwater containment area on the western acreage of the

Landfill that now drains the leachate, stormwater and eroding mud to a southern stream and Buck Branch.

149.    Waste Industries, either itself or in concert with or through WSD, its apparent agent, has repeatedly violated Tenn. Code Ann. § 69-3-114 by openly leaking and discharging leachate in violation of solid waste regulations that require the control and capture of all leachate.  The statute makes if a public nuisance to violate water quality standards. The discharge and leaking of leachate directly violates state statute and regulations.  The discharges are observed to have killed off aquatic life and rendered two streams substantially unusable for recreation, fishing or irrigation. February 2017 sampling by the County of the tributary and Buck Branch revealed highly elevated levels of ammonia, aluminum, and heavy metals such as barium, copper, and nickel consistent with drainage from SAS waste.  A tributary to Buck Branch was found stained in 2017, almost three years after the State documented leachate staining and open leaking at an earlier site inspection along the same drainage route.  Tenn. Code Ann. § 69-3-108(b) and related regulations prohibit discharging leachate to waters of the state and altering the chemical and biological properties, and makes it unlawful to violate the solid waste permit, which also prohibits discharges of leachate/solid waste off site.

150.    It is further a violation of Tenn. Code Ann. §§ 69-3-114 and -108 to violate any water quality standard by rendering a stream completely devoid of life and the other substantially devoid of aquatic life due to leachate draining openly from the Landfill.

151.    Waste Industries, either itself or in concert with or through WSD, its apparent agent, caused the open leaking of leachate, overflowing stormwater ponds full also of leachate and the resulting damage to the bordering streams by unlawful operation of the Landfill and by repeatedly

violating the applicable environmental laws including but not limited to those set out in this pleading.

152.    These acts constitute a substantial interference with the County's use and enjoyment of the land it owns comprising the footprint of the Landfill beyond the waste footprint, which includes the acreage where either itself or in concert with or through WSD, its apparent agent, has located stormwater ponds converted to the illegal use of managing open leachate drainage.

153.    The County has and will continue to suffer the loss of use for the land space where no structures can be built and stormwater trails of mud and sediment dominate the landscape yards from Buck Branch.  The County is entitled to damages for the cost of repairing its real property and restoring it to the condition it was in at the time the parties entered into the Contract, void of pollution and damages caused by Waste Industries' and WSD's operations.  Such damages include, but are not limited to, site assessment and investigation, remedial investigation, environmental cleanup, remedial design and actions, related construction, and site reuse and redevelopment.

**Claim Three – Negligence/Gross Negligence/Negligence Per Se**

154.    All allegations set forth above are incorporated by reference as if fully set forth herein.

155.    The Landfill is operated on land owned by the County.

156.    Waste Industries has held itself out as being involved with WSD, often making representations that WSD is its wholly-owned subsidiary.  Waste Industries often speaks on behalf of WSD when addressing issues related to the management and operations of the Landfill.

157.    Waste Industries has represented to the County, to Tennessee regulatory agencies, and to the public at large that it operates the Decatur County Landfill or is involved in operations alongside WSD.

158.    Waste Industries has cited its company history and financial status to provide assurances to the public and to the County that it is operating the Landfill in an environmentally responsible way.

159.    Waste Industries is involved in the financial management of the Landfill, providing financial oversite and support.

160.    Upon information and belief, Waste Industries pays for certain expenses relating to the Landfill, such as engineering, construction, infrastructure, equipment, and extraordinary expenses.

161.    Upon information and belief, Waste Industries provides various other services with respect to the Landfill, such as hiring, management, personnel, and human resources.

162.    Waste Industries, either itself or in concert with or through WSD, its apparent agent, has operated the Landfill in such a manner as to maximize profit for itself and with disregard for the County's stated goals in the Contract.

163.    Waste Industries knew or should have known that accepting tens of thousands of tons of SAS and other special waste would result in leachate high in ammonia and heavy metals levels that would make municipal treatment impossible.

164.    Waste Industries should have known before accepting the SAS stockpile that aluminum smelter waste is notorious for generating airborne ammonia gases and ammonia in leachate, making it caustic and expensive to manage.

165.     Waste Industries knew or should have known that using SAS generated by Tennessee Aluminum Processing as an alternative daily cover for the Landfill would result in a hazardous and toxic environment, in contravention of industry standards.

166.     Nevertheless, Waste Industries, either itself or in concert with or through WSD, its apparent agent, continued accepting such special waste in large quantities, all while assuring Decatur County and its citizens that the Landfill was being operated in a compliant and responsible manner.

167.     Parsons put Waste Industries on notice after the 90-Day Trial Period that the ammonia in the leachate from the Landfill had spiked.  Yet, Waste Industries, either itself or in concert with or through WSD, its apparent agent, ignored this information, accepted the remaining stockpile of SAS from Tennessee Aluminum Processors, and used it as an alternative daily cover.

168.     As a result of both accepting SAS and using SAS as an alternative daily cover, Waste Industries, either itself or in concert with or through WSD, its apparent agent, has created a toxic environment on and off the Landfill boundary resulting in openly draining leachate, discharges to surface streams and with captured leachate with such high ammonia and or heavy metal levels that it could not be handled by local wastewater treatment facilities.

169.     "Special Wastes" are defined in Tennessee as those that are "difficult or dangerous to manage" and may include "industrial wastes, hazardous wastes" pursuant to Rule 0400-11-01-.01(2) of the Rules of the Tennessee Department of Environment and Conservation Solid Waste Management.

170.     Because Rule 0400-11-01-.01(4)(e) specifically authorizes any operator to refuse to accept any Special Waste, even after it has been approved by TDEC, Waste Industries is charged

with the responsibility of determining if Special Waste poses a risk of violating any permit requirements or risk of failure to comply with any applicable laws.

171.    Waste Industries, either directly or through WSD, had access to the special waste approval applications and could evaluate the applications to make this determination.  Waste Industries has a duty to review these applications and approvals, plus all supporting documents, and make a considered determination of whether accepting that particular waste in a given cell: (a) would be compatible with the other accepted waste; (b) would endanger any structural component of the Landfill (from the liner to the leachate collection); (c) would pose a likelihood of violating permit obligations; or (d) would create a risk of violating Landfill regulations or other state/federal laws.

172.    Waste Industries' failure to fulfill its duties under the Rules of the Tennessee Department of Environment and Conservation Solid Waste Management constitutes negligence *per se*.

173.    Waste Industries paid a local trucking company to haul leachate off-site which was later found in the Spring of 2016 to be dumped in the yard of a resident of Camden, Tennessee and at various other locations, in violation of civil and criminal statutes prohibiting the illegal dumping of toxic leachate.

174.    The County has suffered significant damages and is entitled to an award of damages as a result of Waste Industries' negligence, gross negligence, and negligence *per se*. Such damages include, but are not limited to, site assessment and investigation, remedial investigation, environmental cleanup, remedial design and actions, related construction, and site reuse and redevelopment.

**Claim Four – Injury to Real Property**

175.    All allegations set forth above are incorporated by reference as if fully set forth herein.

176.    The Landfill is operated on land owned by the County.

177.    Waste Industries has held itself out as being involved with WSD, often making representations that WSD is its wholly-owned subsidiary.  Waste Industries often answers on behalf of WSD when addressing issues related to the management and operations of the Landfill.

178.    Waste Industries has represented to the County, to Tennessee regulatory agencies, and to the public at large that it operates the Decatur County Landfill or is involved in operations alongside WSD.

179.    Waste Industries has cited its company history and financial status to provide assurances to the public and to the County that it is operating the Landfill in an environmentally responsible way.

180.    Waste Industries is involved in the financial management of the Landfill, providing financial oversite and support to WSD.

181.    Upon information and belief, Waste Industries pays for certain expenses relating to the Landfill, such as engineering, construction, infrastructure, equipment, and extraordinary expenses.

182.    Upon information and belief, Waste Industries provides various other services with respect to the Landfill, such as hiring, management, personnel, and human resources.

183.    High spiking ammonia is a signature of SAS, which Waste Industries and WSD knew or should have known.  This predictable chemical reaction was exacerbated by Waste Industries and WSD mixing the SAS with innumerable other types of caustic, toxic and potentially

hazardous industrial special wastes, by using SAS as a daily cover, by recirculating leachate, and by failing to adequately cover the waste.

184.     The effects of Waste Industries' and WSD's years of accepting SAS, using it as a daily cover, and failing to properly control it is evidenced by the ensuing leachate management issues and out of control ammonia levels.

185.     Waste Industries, either by virtue of its operation of the Landfill or through its apparent agent, WSD, has created a toxic environment on and off the Landfill boundary resulting in openly draining leachate, discharges to surface streams and with captured leachate with such high ammonia and or heavy metal levels that it could not be handled by Parsons' wastewater treatment facility.

186.     The conditions of open leachate drainage to waters of the State and leaking waste into groundwater in violation of State and Federal law are caused solely by Waste Industries' failure to manage, control the site and comply with the law.

187.     By repeatedly accepting the SAS waste, mixing it with municipal waste, using it as an alternative daily cover, recirculating leachate into the SAS waste, failing to cover the waste pile adequately, failing to collect and contain leachate, and openly draining a leaking cell into a surface stream, the County has suffered damage to acres within the Landfill foot print that are not filled with waste and would have an alternate use or value, but for the negligent acts of Waste Industries and its apparent agent, WSD.

188.     The County is entitled to damages for the cost of repairing its real property and restoring it to the condition it was in at the time the parties entered into the Contract, void of pollution and damages caused by Waste Industries' operations.  Such damages include, but are not

limited to, site assessment and investigation, remedial investigation, environmental cleanup, remedial design and actions, related construction, and site reuse and redevelopment.

### III.    PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, the County of Decatur demands the following:

1) that Waste Industries be required to answer these claims within the time prescribed by law;

2) that the Court declare the rights and obligations of the parties in the manner set forth above;

3) that this Court order Waste Industries to operate the Landfill in compliance with generally accepted landfill standards for the operation of a sanitary landfill and to satisfy all applicable federal, state, and local laws concerning the operation of the Landfill;

4) that the County be awarded a judgment against Waste Industries for compensatory damages;

5) that the County be awarded punitive damages for acts by Waste Industries that were intentional, willful, reckless, fraudulent or malicious;

6) that the costs of this action and reasonable attorneys' fees be awarded to the County;

7) that post-judgment interest and pre-judgment interest be awarded to the County in the maximum amount permitted by law;

8) for a jury of twelve to try this cause; and

9) such further relief as this Court may deem proper.

Respectfully submitted,

*/s/ Lisa K. Helton*

---

Lisa K. Helton, #23684
Phillip F. Cramer, #20697
Amy R. Mohan, #31238
SHERRARD ROE VOIGT & HARBISON, PLC
150 Third Avenue South, Suite 1100
Nashville, TN  37201
(615) 742-4200
lhelton@srvhlaw.com
pcramer@srvhlaw.com
amohan@srvhlaw.com

*/s/ Elizabeth L. Murphy*

---

Elizabeth L. Murphy, #20905
1102 17th Avenue South, Suite 401
Nashville, TN 37212
(615) 327-0404
Elizmurphy966@msn.com

Jason W. Pearcy, #20935
26 West Second Street
Parsons, TN 38363
(731) 847-6909
jason@jpearcylaw.com

*Attorneys for Defendant/Counter-Plaintiff Decatur County, Tennessee*

## <u>CERTIFICATE OF SERVICE</u>

Waste Industries, LLC is being served with process through its Registered Agent. Separately, service of the foregoing on Waste Services of Decatur, LLC was accomplished through the Court's Electronic Filing System this 6th day of June, 2017 upon the following:

James L. Murphy III, #9589
Joel D. Eckert, #25365
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, TN 37203
jmurphy@bradley.com
jeckert@bradley.com

*Attorneys for Plaintiff Waste Services of Decatur, LLC*

*/s/ Lisa K. Helton*
_____
Lisa K. Helton